## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIAN E. MCALLISTER, | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:09-CV-01888 (VLB) |
| | : | |
| PRICE RITE, | : | |
| DEFENDANT. | : | SEPTEMBER 13, 2013 |

### MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #42] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. #44]

### I.      Introduction

Plaintiff Brian McAllister ("McAllister" or "Plaintiff") brings this action *pro se* against Defendant PRRC, Inc., d/b/a Price Rite ("Price Rite" or "Defendant"), alleging employment discrimination and retaliation on the basis of his race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.  Before the Court are the parties' cross motions for summary judgment.  For the reasons that follow, the Defendant's Motion for Summary Judgment [Dkt. #42] is GRANTED and the Plaintiff's Motion for Summary Judgment [Dkt. #44] is DENIED.

### II.     Initial Matters

As an initial matter, the Court notes that the *pro se* Plaintiff has failed to comply with Rule 56(a) of the Local Rules of Civil Procedure for the District of Connecticut.  Local Rule 56 requires that a party filing a summary judgment

motion annex a "concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)1. Local Rule 56(a)2 requires that a party opposing a motion for summary judgment must then file an answering document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)2.  Each statement of material fact in a Local Rule 56(a)1 or Local Rule 56(a)2 statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)2 statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)3.  Further, "[a]ll material facts set forth in [a moving party's 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party."  D. Conn. L. Civ. R. 56(a)1.  Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.  *See SEC v. Global Telecom Servs. L.L.C.*, 325 F.Supp.2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006).

Here, McAllister has failed to respond to the Defendant's assertions of undisputed fact proffered in its 56(a)1 statement, and he has also failed to provide a 56(a)1 statement in connection with his summary judgment motion that cites to

specific affidavits or evidence in the record.  In his motion, the Plaintiff references only a few pieces of documentary evidence, only two of which he has attached to his motion.  As McAllister is proceeding *pro se* the Court must liberally construe his submissions.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) ("This policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training") (internal quotation marks and citation omitted).  However, there is a limit to the indulgence of *pro se* litigants' inexperience and therefore *pro se* parties are not excused from abiding by the Federal Rules of Civil Procedure. *Ryder v. Washington Mut. Bank, F.A.*, 501 F. Supp. 2d 311, 314 (D. Conn. 2007) (DJS).  Thus, the Court will deem admitted any alleged fact proffered by either the Defendant or the Plaintiff where such fact is supported by the evidence in the record.

### III.   Factual Background

Price Rite is a supermarket chain with locations throughout the Northeast. [Dkt. 42-2, D's 56(a)1 Stmnt. ¶1].  Brian McAllister was hired to work at Price Rite's Bridgeport, Connecticut location on September 13, 2005 as a cashier.  [*Id.* at ¶2]. He was later assigned to the Produce Department, and then to the Meat Department as a Meat Clerk beginning on December 16, 2007.  [*Id.* at ¶¶ 7, 8].

In January 2008 Price Rite announced that it had an opening for the position of Supervisor for the Meat Department at the Bridgeport store.  [*Id.* at ¶9].  Price Rite hired Richard Uva from outside the company on or about February 8, 2008.  [*Id.* at ¶10].  Subsequently, on July 24, 2008, the Plaintiff filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that Price Rite had discriminated against him based on his race and color when it denied him a promotion to Assistant Manager in the Meat Department.  [*Id.* at ¶11; Dkt. 42-3 Exh. C, CHRO Compl. p. 13/35].  Price Rite and McAllister resolved this CHRO complaint by way of an Agreement dated September 5, 2008, whereby McAllister was promoted to the position of Meat Supervisor (a second position created by Price Rite which offered a pay raise) in exchange for his withdrawal of the CHRO complaint and his agreement to release Price Rite from liability stemming from the claims asserted in the CHRO complaint.  [Dkt. 42-3 Exh. D, Agreement, p. 15/35; Dkt. 42-2, D's 56(a)1 Stmnt. ¶¶13, 14].  Kathy Freedman, Price Rite's Manager of Human Resources, signed the Agreement along with McAllister.  [Dkt. 42-3 Exh. D, Agreement, p. 15/35; Dkt. 42-3 Freedman Aff., p.1 ¶1].  During his deposition, McAllister testified that he was satisfied with this promotion.  [Dkt. 42-2, D's 56(a)1 Stmnt. ¶15].

On November 23, 2008, Bridgeport Store Manager Tom Veale received complaints from other associates about Plaintiff talking to people for long periods of time while on the sales floor.  [*Id.* at ¶17].  Later that day, Mr. Veale informed the District Manager, Pat Stramaglia, of these complaints, and Mr. Stramaglia discussed the complaints with Loss Prevention Officer Ralph

4

Fappiano, who was at the Bridgeport store that day.  [*Id.* at ¶18].  Mr. Fappiano informed Mr. Stramaglia that he observed Mr. McAllister talking to an unknown person for ten minutes while standing near the meat case on the sales floor, and that he also observed that Plaintiff spent a further ten minutes in the employee break room immediately after punching back in from a legitimate fifteen minute break.  [*Id.* at ¶¶ 19, 20].  Mr. Stramaglia then sent an email to Robert Armor, a Loss Prevention Supervisor covering the Price Rite stores in Connecticut, describing what Mr. Fappiano had seen.  [*Id.* at ¶21].

Mr. Armor visited the Bridgeport Price Rite store on November 24, 2008 with Mr. Fappiano and Matt Palmer, a Loss Prevention Trainee, to follow up on these observations.  [*Id.* at ¶22.  Armor, Fappiano, and Palmer compared the store's video surveillance tapes to Mr. McAllister's electronic time records and discovered that McAllister routinely took legitimate fifteen minute breaks, after which he would clock back in and then return to the break room for amounts of time of up to an additional fifteen minutes.  [*Id.* at ¶23; Dkt. 42-3 Exh. F, Investigation Report, p. 19/35].  Specifically, the investigation of this matter revealed that Mr. McAllister spent time in the employee break room or outside of the store while punched in and on the clock on the dates and for the periods of time as follows: October 31, 2008 - 13 minutes; November 13, 2008 - 15 minutes; November 14, 2008 - 12 minutes; November 17, 2008 - 12 minutes; November 19, 2008 - 18 minutes; November 20, 2008 - 10 minutes; November 22, 2008 - 7 minutes; November 23, 2008 - 15 minutes. [Dkt. 42-2, D's 56(a)1 Stmnt. ¶¶24, 25; Dkt. 42-3 Exh. F, Investigation Report, p. 19/35].  These findings were documented

in a written investigation report prepared by Mr. Armor.  [Dkt. 42-5, Armor Cert. pp. 4, 5].

Following the investigation, on November 24, 2008, Matt Palmer and Price Rite's Human Resources Generalist, Alvera Monroe, met with the Plaintiff.  [Dkt. 42-2, D's 56(a)1 Stmnt. ¶26].  The investigation report states as follows:

> During the interview, McAllister stated that one of the reasons he takes a break (while punched "in") is because he doesn't want to "lose" fifteen minutes of paid time.

[*Id.* at ¶27; Dkt. 42-3 Exh. F, Investigation Report, p. 19/35].  At the conclusion of the interview, Mr. McAllister was asked to provide Price Rite with a written statement.  [Dkt. 42-2, D's 56(a)1 Stmnt. ¶28].  He complied with the request and provided a statement that reads in part

> At times, I may go out and take 15 min. break and come back, and punch out for 15 min break so I won't lose my 15 min.

[*Id.* at ¶29].

At or around the time of his hire, McAllister signed an acknowledgement of receipt of Price Rite's Handbook, which contained sections entitled "Recording Your Work Time" and "Rest Breaks and Meal Periods."  [*Id.* at ¶3].  In the "Recording Your Work Time" section, the Handbook states, in relevant part, that

> you are required to 'punch' in and out for all shifts, breaks and meal periods, according to your schedule. . . . If you are unable to record your time at the time clock, or receive a 'rejected' message at the time clock, you are required to notify the Manager on Duty immediately.

[*Id.* at ¶4].  This section further provides that "[r]epeated failures to record your time properly will result in disciplinary action up to and including termination." [Dkt. 42-3 Exh. B, Handbook, p. 9/35].

The Handbook section entitled "Rest Breaks and Meal Periods" states that "[t]ime scheduled for rest breaks and meal periods must be followed. . . . Overstaying rest breaks or meal periods affects everyone and will result in disciplinary action."  [Dkt. 42-2, D's 56(a)1 Stmnt. ¶5].  The Handbook also includes a section entitled "Disciplinary Procedures," which provides that "Team Members who violate Company rules, policies or procedures will be subject to disciplinary action up to and including immediate dismissal."  [*Id.* at ¶6].  It further warns that "the employment relationship is terminable 'at will'" and that "the Company has no obligation to provide any warnings or to follow any procedures prior to discharge of a Team Member. . . . with or without cause or with or without notice."  [*Id.*].

Based on the results of the investigation and interview with Mr. McAllister, Manager of Human Resources Kathy Freedman determined that Plaintiff had engaged in theft of time and made the decision to terminate his employment. [Dkt. 42-2, D's 56(a)1 Stmnt. ¶¶30, 31; 33].  McAllister was terminated on November 25, 2008.  [*Id.* at ¶33].  Ms. Freedman has affirmed that during 2007 and 2008, six other employees at the Bridgeport Price Rite were found to have committed theft of time, and all six were terminated.  [*Id.* at ¶32 n.2]. Freedman has further affirmed that theft of time always results in immediate termination of employment, and that no Price Rite employee who has been found to have

committed theft of time has not been terminated.  [*Id.* at ¶32; Dkt. 42-3 Freedman
Aff., p.3 ¶¶13, 14].

On December 11, 2008, after the termination of his employment, Plaintiff
filed a complaint with the CHRO alleging that Price Rite terminated his
employment because of his race and color and in retaliation for McAllister's filing
of his previous CHRO complaint on July 24, 2008.  [Dkt. 42-8, CHRO Compl.
12/11/08, p. 2-4].  McAllister alleged that around October 24, 2008, he had a
conversation regarding work hours with District Manager Stramaglia during
which Mr. Stramaglia allegedly stated "you people have no logic," which
McAllister believed to be in reference to African Americans.  [*Id.* at p.3 ¶7].
McAllister further alleged that Meat Supervisor Richard Uva, who is Caucasian,
"worked significantly less nights" than he did, and that, while Uva was not
required to provide a doctor's note when he missed work due to illness,
McAllister was required to do so.  [*Id.* at p.3 ¶¶7, 8].  The CHRO conducted a Merit
Assessment Review of Plaintiff's complaint on April 21, 2009 and found no
reasonable possibility that investigating the complaint would result in a finding of
reasonable cause.  [Dkt. 42-8, Merit Assessment Review, p. 8/19].  The complaint
was dismissed.  [*Id.* at pp. 10/19].  Plaintiff requested reconsideration by the CHRO
of the dismissal of his complaint.  [Dkt. 42-8, CHRO reconsideration denial, pp.13-
19].  In January, 2010 the CHRO denied his reconsideration request, finding that
"[t]here was no direct or circumstantial evidence provided to support the
Complainant's position that he had been discriminatorily terminated or retaliated
against" and that "[t]here is no evidence in the file that there is a causal

connection between Complainant's protected activity and the actions of the Respondent."  [*Id.* at 17/19].

IV.   <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481,

2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

Further, when deciding whether summary judgment should be granted in a discrimination case, courts must take additional considerations into account. *Desir v. City of New York*, 453 F. App'x 30, 33 (2d Cir. 2011).

> A trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue. Affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.  Summary judgment remains appropriate in discrimination cases, as the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation.

*Id.*  Thus, "[a]t summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).  "A court is to examine the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff.' " *Id.* at 102 (citations omitted).  "A motion for summary judgment may be defeated where "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id.* at 103 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).

## V.   Discussion

Two claims remain against Defendant Price Rite in this action: the first for racial discrimination in violation of Title VII, and the second for retaliation in contravention of Title VII.[1]  Defendant urges the Court to grant summary judgment in its favor on Plaintiff's claims of racial discrimination on two grounds: first, because Plaintiff cannot make out a prima facie showing of racial discrimination as he can point to no evidence that his termination occurred under circumstances giving rise to an inference of discrimination, and second, even if he could, Plaintiff cannot demonstrate that Price Rite's legitimate, nondiscriminatory reason for terminating his employment, namely that he stole company time, is a pretext for discrimination.  Defendant also urges that McAllister's retaliation claim must be denied because Plaintiff has proffered no evidence of a causal relationship between his July 2008 complaint to the CHRO of racial discrimination and his termination four months later.

---

[1] On March 1, 2012 the Court granted the Defendants' partial motion to dismiss, thus terminating individual defendants Kathy Freedman, Patrick Stramaglia, Lou White, Ralph Fappiano, Howard Fruchterman, and Matt Palmer, and dismissing Plaintiff's failure to promote claim.

In response, Plaintiff does not address his racial discrimination claim, but instead moves for summary judgment on the grounds that "a justifiable controversy exists as plaintiff currently asserts retaliation due to an adverse actions [sic] of employment discrimination by the defendant as it pertains to the plaintiff's complaint of employment discrimination with the Commission on Human Rights and Opportunities [ ] on July 24, 2008."  [Dkt. 44, P's MSJ, p. 1]. Plaintiff notes that the federal Equal Employment Opportunity Commission ("EEOC") issued Plaintiff a Dismissal and Notice of Rights letter on August 31, 2009, which notified McAllister that the agency had "adopted the findings of the state or local fair employment practices agency that investigated this charge." [Dkt. 44, EEOC letter, p. 12/14].  Plaintiff appears to believe that this EEOC letter confirms the agency's reliance on the determination of the Connecticut Department of Labor ("DOL"), before which McAllister participated in an unemployment benefits hearing on December 16, 2008.  [*See* Dkt. 44, P's MSJ, pp. 2-3, ¶¶3, 4, 5].  In a Fact Finding Report completed January 5, 2009, the CT DOL found that "[t]he claimant was discharged because he did not punch out for his fifteen minutes [sic] breaks" but that, based on McAllister's denial that he left the store without punching out, "claimant was discharged for reasons other than willful misconduct in the course of employment."  [Dkt. 44, CT DOL letter, p. 13/14].  Plaintiff asserts that this DOL letter indicates "vindictiveness against the plaintiff per the CDOL."  [Dkt. 44, P's MSJ, p. 6, ¶15].

Plaintiff's reliance on the CT DOL's findings is misplaced.  The state fair employment practices agency in Connecticut is the Connecticut Commission on

Human Rights and Opportunities.  *See* Conn. Gen. Stat. § 46a-54 (enumerating the powers of the CHRO in performing its duties under the CT Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51, et seq.).  Thus, the findings adopted by the EEOC were those made by the CHRO.  Further, Connecticut's General Statutes specifically enumerate that findings reached during unemployment proceedings have no preclusive effect on "any other action or proceeding" except those proceeding under Connecticut's unemployment compensation statutes.  Conn. Gen. Stat. § 31-249g(b).  The issues raised in the Plaintiff's unemployment proceedings were necessarily different from those raised in his civil rights proceedings before the CHRO.  Specifically, an employee's discharge or suspension due to "willful misconduct" disqualifies him or her from receipt of unemployment compensation, which is a determination the administrator of the Unemployment Compensation Act is required to make.  Conn. Gen. Stat. § 31-236(a)(2)(B).  The DOL's findings of fact did not include any analysis of whether Plaintiff suffered discrimination or retaliation, only whether Plaintiff was discharged as a result of willful misconduct, which would disqualify him from receipt of benefits.  Therefore, even if the DOL's findings supported Plaintiff's contention that he experienced discrimination and retaliation, which they do not, those findings would have no preclusive effect on any finding of this Court or of any federal or state fair employment agency.

The Court, then, will analyze Plaintiff's discrimination and retaliation claims under the traditional rubric of the *McDonnell Douglas* burden-shifting analysis discussed below and will not consider the DOL's findings in its analysis.

### a.  Title VII Racial Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire any individual or to discharge any individual … because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Race discrimination claims under Title VII of the Civil Rights Act of 1964 are analyzed under the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Men of Color Helping All Soc., Inc. v. City of Buffalo*, 12-3067-CV, 2013 WL 3285208, at *3, --- F. App'x --- (2d Cir. July 1, 2013); *Ruszkowski v. Kaleida Health Sys.*, 422 F. App'x 58, 60 (2d Cir. 2011).  Under this framework, a plaintiff establishes a prima facie case of intentional discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination."  *Men of Color*, 12-3067-CV, 2013 WL 3285208, at *3 (citing *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012)).  The burden upon the plaintiff to prove a prima facie case is minimal.  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).  *See also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have characterized plaintiff's prima facie burden as 'minimal' and 'de minimis.'").  However, "[a] plaintiff cannot establish a prima facie case based on 'purely conclusory allegations of discrimination, absent any concrete particulars.'" *Ruszkowski*, 422 F. App'x at 60 (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

14

"If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action.  If the employer does so, the burden then returns to the plaintiff to demonstrate that race was the real reason for the employer's adverse action." *Men of Color*, 12-3067-CV, 2013 WL 328520, at *3 (quoting *Reynolds*, 685 F.3d at 202).  "[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).  In sum, "[t]he plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and citation omitted).  "Importantly, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reynolds*, 685 F.3d at 202 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

### i.  Plaintiff's Prima Facie Case of Discrimination

Defendant Price Rite concedes that McAllister has satisfied the first three elements of his prima facie case of racial discrimination, but argues that Plaintiff cannot meet his burden to prove the fourth element, namely that his termination occurred under circumstances giving rise to an inference of discrimination.  The Court agrees.

Here, Plaintiff has provided no evidence in connection with his motion for summary judgment or opposition to the Defendant's motion for summary judgment that would allow the Court to conclude that his termination was discriminatory.  Indeed, the only two pieces of evidence the Plaintiff has provided in connection with his opposition or with his own motion are a determination letter from the CT DOL resulting from his application for unemployment benefits, which the Court will not consider and which, in any case, fails to support Plaintiff's contentions, and a dismissal letter from the EEOC noting that it was adopting the findings of the CHRO, which itself found that Plaintiff's claim of discrimination had no merit.

There is likewise no evidence in the record before this Court that would support an inference of discrimination based upon the allegations of racial discrimination that Plaintiff noted in his December 11, 2008 complaint with the CHRO following the termination of his employment.  "It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: ... 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.' " *Ragin v. E. Ramapo Cent. Sch. Dist.*, 417 F. App'x 81, 82 (2d Cir. 2011) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) and *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). McAllister has not met his burden of demonstrating any of the above

16

circumstances such that a rational fact finder could infer a discriminatory motive for his termination.

In his CHRO complaint McAllister alleged that around October 24, 2008, he had a conversation regarding the assignment of night shifts with District Manager Stramaglia during which Mr. Stramaglia allegedly stated "you people have no logic," which McAllister believed to derogatorily reference African Americans. [Dkt. 42-8, CHRO Compl. 12/11/08, p.3 ¶7].  "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007).  "Often, however, an employer will argue that a purportedly discriminatory comment is a mere 'stray remark' that does not constitute evidence of discrimination." *Id.*  "Although courts have often used the term 'stray remark' to refer to comments that do not evince a discriminatory motive, the Second Circuit has found that the term 'stray remark' 'represented an attempt - perhaps by oversimplified generalization - to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.' " *Galimore v. City Univ. of New York Bronx Cmty. College*, 641 F. Supp. 2d 269, 284 (S.D.N.Y. 2009) (quoting *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)).

"Accordingly, the task is not to categorize remarks 'either as stray or not stray,' and 'disregard [remarks] if they fall into the stray category,' but rather to assess the remarks' 'tendency to show that the decision-maker was motivated by

assumptions or attitudes relating to the protected class.' " *Id.* (citation omitted).

Courts have found the following factors relevant to such a determination: "(1)

who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-

worker; (2) when the remark was made in relation to the employment decision at

issue; (3) the content of the remark, i.e., whether a reasonable juror could view

the remark as discriminatory; and (4) the context in which the remark was made,

i.e., whether it was related to the decisionmaking process." *Silver*, 490 F. Supp.

2d at 363 (citations omitted).  "In the absence of a clearly demonstrated nexus to

an adverse employment action, stray workplace remarks are insufficient to defeat

a summary judgment motion." *Almonord v. Kingsbrook Jewish Med. Ctr.*, No.04–

CV–4071(NGG), 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) (citing *Danzer v.

Norden Sys., Inc.*, 151 F.3d 50, 56 (2d. Cir.1998)).

Moreover, it is well established that "[s]tray remarks, even if made by a

decision maker, do not constitute sufficient evidence [to support] a case of

employment discrimination." *Danzer*, 151 F.3d at 56; *Abdu–Brisson v. Delta Air

Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("the stray remarks of a decision-

maker, without more, cannot prove a claim of employment discrimination").

"[R]emarks made by someone other than the person who made the decision

adversely affecting the plaintiff may have little tendency to show that the

decision-maker was motivated by the discriminatory sentiment expressed in the

remark." *Johnson v. C. White & Son, Inc.*, 772 F. Supp. 2d 408, 414 (D. Conn.

2011) (quoting *Tomassi*, 478 F.3d at 115).  *See also Campbell v. Alliance Nat'l Inc.*,

107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers

or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.") (internal quotation marks and citation omitted).

Here, District Manager Stramaglia was not a decision-maker in the termination of Plaintiff's employment.  Store Manager Tom Veale received the initial complaints from other Price Rite associates that Plaintiff was talking to people while on the sales floor.  He informed District Manager Stramaglia, who in turn discussed the complaints with Loss Prevention Officer Fappiano, who confirmed that he had observed Plaintiff in the break room while on the clock. Stramaglia sent an email to Robert Armor, a Loss Prevention Supervisor, who then conducted an investigation along with trainee Matt Palmer.  Palmer and Human Resources Generalist Alvera Monroe interviewed McAllister, and Manager of Human Resources Kathy Freedman later made the decision to terminate McAllister's employment.  Thus, as Stramaglia did not play an active part in the decision to terminate Plaintiff's employment, this remark, which occurred one month prior to termination of Plaintiff's employment and did not relate to Plaintiff's alleged theft of company time, carries little weight.

Furthermore, the comment "you people have no logic" refers to no particular group of people and it is unlikely that a reasonable juror could conclude that the comment, without more, was intended to refer to or discriminate against African Americans in particular.  McAllister's own deposition testimony as follows bolsters the conclusion that this alleged remark contained no discriminatory animus:

**19**

Q: Do you remember having [the] conversation with Mr. Stramaglia?

A: Yes.

Q: Where did it take place?

A: At Price Rite.

Q: In what part of the store?

A: Don't recall.

Q: Was anybody else present?

A: I don't recall.

Q: Tell me as best as you can remember exactly what each of you said during this conversation?

A: I don't remember.

Q: Do you remember how the conversation started?

A: No.

Q: Do you remember what you said to Mr. Stramaglia immediately before he said 'you people have no logic'?

A: Don't recall.

Q: Do you know what he was referring to when he said 'you people have no logic'?

A: I don't know what he's referring to, but he was talking in my direction towards me.

Q: What is it about his comment that makes you believe he was referring to African-Americans?

A: It was me and him, no one else present.

Q: Are there any other facts that make you believe that he was referring to African-Americans as having no logic?

A: I'm African-American.

Q: Okay.  Are there any other facts that make you believe that Mr. Stramaglia was referring to African-Americans as having no logic?

A: I wouldn't know that.

Q: Do you remember him saying anything else during this conversation?

A: No, I don't recall.

[Dkt. 42-7, McAllister Depo. 39:23 – 41:8].  McAllister's own testimony shows that

there is no inference to be drawn by this comment; the comment itself is

unspecific, Stramaglia did not make the decision to terminate McAllister's

employment, and McAllister himself can point to neither a connection between this comment and his termination nor any relation this comment may have had to any protected class, save that it was directed toward McAllister, who is African American. No further evidence exists in the record to corroborate McAllister's claim that this comment constituted discrimination.

Given the complete lack of evidence in the record, the Court concludes that Stramaglia's alleged remark does not give rise to an inference of discrimination such that McAllister can make out a prima facie case of discrimination. The comment is not facially discriminatory, the remark was not uttered by a Price Rite employee involved in the decision to terminate McAllister's employment, and there is no discernible nexus between Stramaglia's comment and Freedman's decision to terminate McAllister for theft of company time. No reasonable juror could conclude on the basis of Stramaglia's isolated comment that McAllister's termination occurred under circumstances giving rise to an inference of discrimination.

McAllister further alleged in his CHRO complaint that Meat Supervisor Richard Uva, who is Caucasian, "worked significantly less nights" than he did, and that, while Uva was not required to provide a doctor's note when he missed work due to illness, McAllister was required to do so, evidencing racial discrimination. [Dkt. 42-8, CHRO Compl. 12/11/08, p.3 ¶¶7, 8]. Price Rite has put forth evidence in the record to dispel both of these allegations, and Plaintiff has not countered with either a demonstration of evidence supporting his claims or with any argument that these two allegations had any basis in racial animus.

Time records for both Uva and McAllister demonstrate that, during the three month period in which both Uva and McAllister were employed as Meat Supervisors, both men worked nearly identical numbers of night shifts.[2]  [Dkt. 42-3 Exhs. H, I, Uva/McAllister time records pp.23-35/35].  Moreover, Store Manager Tom Veale has affirmed that the reason that he required a doctor's note from Mr. McAllister but did not require one from Mr. Uva was that Mr. Uva's absences (August 29 and October 24, 2008) were single day absences; in contrast, Plaintiff was absent for consecutive days.[3]  [Dkt. 42-6, Veale Cert. ¶¶ 4, 5].

        Furthermore, Kathy Freedman, the Human Resources Manager who made the decision to terminate McAllister's employment, affirmed that she first became aware of McAllister's complaint about disparate treatment in night shift scheduling and the requirement of doctors' notes only after McAllister's termination, when he filed his CHRO complaint in December 2008.  [Dkt. 42-3 Freedman Aff., p.1 ¶18].  She learned of Stramaglia's stray remark at the same time, after McAllister's termination.  [*Id.*].

        Plaintiff has offered no countervailing evidence in the record whatsoever to contradict Price Rite's well-founded assertions that his claims of disparate treatment are meritless.  Indeed, Plaintiff's own deposition testimony indicates

---

[2] In its Merit Assessment Review, the CHRO noted that between August and November, 2008, McAllister worked 29 night shifts while Uva worked 26, a "statistically insignificant" difference. [Dkt. 42-8, Merit Assessment Review, p. 9/19].  Kathy Freedman has affirmed that a review of McAllister's and Uva's time records from this period demonstrate that McAllister worked three more night shifts than did Uva.  [Dkt. 42-3 Freedman Aff., p.1 ¶19].

[3] The CHRO's Merit Assessment Review concludes: "The records with regard to the medical note request, similarly fails to demonstrate any disparate application of policy."  [Dkt. 42-8, Merit Assessment Review, p. 9/19].

that he can offer no evidentiary proof that his termination was the result of discrimination and not of theft of time:

> Q:  [T]ell me all the facts that you believe support your claim that you were discriminated against.
> A:  I don't recall right now.
> Q:  Is there anything you could look at to - -
> A:  I have no documentation.
> Q:  - - help you remember?
> A:  No.
> Q:  We've introduced as an exhibit your complaint before the CHRO.  Do you think looking at that would help you remember?
> A:  Probably not.
> Q:  If we were in a court of law right now and if you were on the stand, what would you tell the jury to support your claim that you were discriminated against?
> A:  I'm not sure what I would say.

[Dkt. 42-7, McAllister Depo. 75:1-17].

Notably, Plaintiff has offered no evidence in the record that he was treated differently than any other Price Rite employee accused of theft of time. Conversely, Price Rite has proffered evidence that during 2007 and 2008, six other employees at the Bridgeport Price Rite store were found to have committed theft of time, and all six were terminated.  [Dkt. 42-2, D's 56(a)1 Stmnt. ¶32 n.2]. Human Resources Manager Freedman has further affirmed that theft of time always results in immediate termination of employment, and that no Price Rite employee who has been found to have committed theft of time has not been terminated.  [*Id.* at ¶32; Dkt. 42-3 Freedman Aff., p.3 ¶¶13, 14].

The evidence in the record before the Court demonstrates that, after receiving complaints from McAllister's coworkers about his use of time, Price Rite commenced an investigation through its Loss Prevention staff which revealed specifically that McAllister had spent time in the employee break room while punched in and on the clock on eight separate occasions, comprising 102 total minutes of company time during which McAllister was not working. McAllister's movements were recorded on videotape and he  admitted to this practice in a written statement he provided at the conclusion of an interview during the investigation, stating that

> At times, I may go out and take 15 min. break and come back,
> and punch out for 15 min break so I won't lose my 15 min.

[Dkt. 42-2, D's 56(a)1 Stmnt. ¶29].  When asked during his deposition whether he believed he should have been paid for time that he did not work, McAllister conceded that "[i]f I didn't work, I shouldn't get paid for it."  [Dkt. 42-7, McAllister Depo. 57:17-20].  Moreover, McAllister admitted under oath that he can provide no evidence that non-minority employees were treated differently than he was in terms of theft of time:

> Q: Do you know whether there were any non African-American
> employees who took breaks while they were still punched in –
> A: I –
> Q: Let me finish my question, please.  – but who were not
> terminated?
> A: I wouldn't know that information.
> Q: . . . Do you know of any employees at all who took breaks
> while they were still punched in?
> A:  No.

[Dkt. 42-7, McAllister Depo. 75:18 – 76:4].  Lastly, the record indicates that Price Rite's Handbook – of which Plaintiff received a copy – contains clear policies requiring Team Members to punch in and out for all shifts, breaks and meal periods, and warning that overstaying these periods or failing to follow prescribed policies would result in disciplinary action up to and including immediate dismissal.  Given the overwhelming evidence that Plaintiff violated company policy, and given Plaintiff's lack of evidence that his termination was in fact for discriminatory reasons, no reasonable juror could find that McAllister was a victim of disparate treatment or was terminated for reasons other than failing to punch out during times he was not working.  *See Deabes v. Gen. Nutrition Corp.*, 3:08 CV 372 (WWE), 2010 WL 1331111, at *3 (D. Conn. Mar. 31, 2010) aff'd, 415 F. App'x 334 (2d Cir. 2011) (no inference of discrimination could be drawn where plaintiff could not show that similarly situated employees outside of the protected class were treated more favorably than was plaintiff); *Crawford v. Sysco Food Servs. of Connecticut, LLC*, 554 F. Supp. 2d 257, 263 (D. Conn. 2008) (AWT) (granting summary judgment in favor of employer on race discrimination claim where plaintiff provided no evidence of company policy being applied differently to a similarly situated employee).

Because Plaintiff has failed to submit any competent evidence to the Court in support of his motion or in opposition to Defendant's, and because Price Rite has submitted evidence of its own lack of racial animus in the face of a legitimate reason for Plaintiff's discharge, there is consequently no evidence in the record that Price Rite's conduct gives rise to an inference of discrimination such that

Plaintiff's prima facie case is fulfilled.  *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.");  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 19 (2d Cir. 1995) ("speculative assertions on matters as to which [plaintiff] admitted he had no knowledge and no evidence" do not give rise to an inference of discrimination and are insufficient to defeat summary judgment).  Consequently, Plaintiff has failed to make out a prima facie case of racial discrimination in violation of Title VII.

### ii.  Lack of Pretext

Even assuming, arguendo, that Plaintiff has established a prima facie case of discrimination, Price Rite has articulated a legitimate, non-discriminatory reason for terminating McAllister's employment: a loss prevention investigation revealed that McAllister had routinely taken breaks while on the clock, constituting theft of time and violating company policy.  For the same reasons that he failed to establish an inference of discrimination, McAllister fails to demonstrate that Price Rite's proffered reason is a mere pretext for discrimination and that racial animus was the true reason for the adverse employment action taken against him.  Plaintiff has offered no evidence in the record whatsoever to rebut Price Rite's well-documented reason for his termination.  Moreover, McAllister testified under oath that he could provide no evidence to support a conclusion that the reason given for his termination was a mere pretext for discrimination:

> **Q: Do you have any evidence to support a finding that the reason you were told you were being terminated is not the real reason for your termination?**
> **A: I have no documentation at this time.**
> **Q: Do you have any other information that would support that?**
> **A: I have no documentation at this time.**
> **Q: Do you know of any witnesses who could support your claim?**
> **A: I don't know no one at this time.**
> **Q: Are there any facts that you think you could testify about that would support that claim?**
> **A: I don't know.**

**[Dkt. 42-7, McAllister Depo. 79:14 – 80:1].**

McAllister has failed to rebut in any way Price Rite's legitimate non-discriminatory reason for his termination. *See Bonaparte v. New York City Dep't of Hous. Pres. & Dev.*, 94 CIV. 5106 DC, 1997 WL 148252 (S.D.N.Y. Mar. 31, 1997) (no pretext of discrimination existed for termination where plaintiff proffered no evidence aside from his own affidavit and employer offered legitimate, non-discriminatory reason that plaintiff stole time and supplies); *Johnson v. C. White & Son, Inc.*, 772 F. Supp. 2d 408, 414 (D. Conn. 2011) (CFD) (citing *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("Courts have held that, while a plaintiff does not have to demonstrate conclusive proof of discrimination to withstand summary judgment, a plaintiff must at least produce some definite facts that a jury could infer discrimination from.").  Thus, summary judgment in favor of Defendant Price Rite is GRANTED as to Plaintiff's Title VII racial discrimination claim.

  **b.** <u>**Title VII Retaliation**</u>

McAllister alleges that his termination was in retaliation for his filing of his first CHRO complaint on July 24, 2008, which complaint he settled with Price Rite pursuant to a written Agreement and in exchange for his withdrawal of the CHRO complaint.  Defendant denies Plaintiff's claim of retaliation and counters that McAllister's retaliation claim must fail because he cannot demonstrate a causal connection between his termination and the filing of the CHRO complaint.

Under Title VII, it is unlawful for an employer to discriminate against an applicant for employment because that applicant "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  The burden-shifting framework laid out in *McDonnell Douglas*, 411 U.S. at 802, governs retaliation claims under Title VII.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).   To establish a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) that the defendant took adverse employment action against the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Id.* at 125; *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  The Supreme Court has recently held that "[t]itle VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).  Thus, the establishment of a causal connection between the protected activity and the adverse action "requires proof

that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. at 2533.  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Summa*, 708 F.3d at 125 (internal quotation marks and citations omitted).

Plaintiff cannot make out a prima facie case of retaliation because he cannot demonstrate sufficient evidence to suggest that the filing or settlement of his first CHRO complaint was the but for cause of his termination.  The record evidences the following: Plaintiff filed his first complaint with the CHRO on July 24, 2008 alleging that racial discrimination motivated Price Rite to not promote him to a managerial position in the Meat Department.  Kathy Freedman has affirmed that, upon the filing of this complaint, she investigated the matter.  [Dkt. 42-3 Freedman Aff., p.2 ¶8].  Price Rite and McAllister resolved this complaint by written agreement dated September 5, 2008.  Per the agreement signed by Plaintiff and Kathy Freedman, McAllister was promoted to the position of Meat Supervisor, a position offering a pay raise, in exchange for the immediate withdrawal of his CHRO complaint.  McAllister performed the position of Meat Supervisor until Store Manager Tom Veale received complaints from other associates that McAllister had been abusing time.  Veale informed District

Manager Stramaglia, who had been the subject of Plaintiff's July CHRO

complaint, and Stramaglia informed Price Rite's loss prevention team, which

conducted an investigation.  The evidence in the record demonstrates clearly that

McAllister repeatedly violated company policies by remaining on the clock during

time when he was not working, an allegation that McAllister does not deny and in

fact admitted in writing as a part of Price Rite's investigation.  Based on the

investigation and the interview conducted by a loss prevention employee and a

human resources employee with McAllister, Manager of Human Resources

Freedman made the decision to and did terminate McAllister's employment on

November 25, 2008, in accordance with Price Rite's practice of always terminating

employees who have committed theft of company time.

Plaintiff has failed to present any evidence that his July 2008 CHRO

complaint and his termination four months later are in any way connected.

Tellingly, at his deposition, Plaintiff testified that he did not know what facts

would support his claim for retaliation:

> Q:  What facts do you rely on to support your claim that you
> were retaliated against by Price Rite?
> A:  I don't have any documentation at this time.
> Q:  But I'm asking you about facts, not necessarily documents.
> You know, what facts, I mean what do you remember that you
> might testify about that would support a claim for retaliation?
> A:  I don't know at this time.

[Dkt. 42-7, McAllister Depo. 81:16-23].  The only  evidence to which Plaintiff cites

in support of his retaliation claim is the mere fact that he filed a complaint with

the CHRO in the first place.  However, balanced against the ample evidence of

Price Rite's legitimate reason for his termination as discussed previously, and especially in light of the fact that the direct results of Plaintiff's July 2008 CHRO complaint were a *promotion and a pay raise*, Plaintiff's conclusory allegation of retaliation is insufficient to permit a rational finder of fact to infer a retaliatory motive.

Moreover, even if McAllister has proffered sufficient record evidence to establish a prima facie case of discrimination, he has utterly failed to demonstrate that Price Rite's legitimate non-discriminatory reason for his termination was a pretext for discrimination.  As discussed at length in relation to Plaintiff's discrimination claim, McAllister's theft of company time and violation of company policy constitutes a legitimate reason for his termination; McAllister has failed to adduce any evidence in the record that retaliatory animus was the true reason for his discharge and has expressly admitted in the record that he did, in fact, fail to punch out when he was not working.  As such, no reasonable trier of fact could conclude that Price Rite's reason for McAllister's termination was mere subterfuge for retaliation.

Summary judgment is therefore GRANTED as to McAllister's Title VII retaliation claim.

## VI.    Plaintiff's Remaining Arguments

The Plaintiff has put forth a number of extraneous arguments in his motion for summary judgment, several of which the Court will briefly review.

First, Plaintiff contends in his motion that, upon questioning about Price Rite's liability insurance during deposition, Defendant's counsel admitted that Price Rite has funds to pay only for its legal representation.  [Dkt. 44, P's MSJ, pp. 4-5, ¶¶11-13].  Plaintiff evidently believes that this response indicates Price Rite's bias or prejudice in its defense of this action.  The portions of the deposition that Plaintiff deems to be relevant are as follows:

> McAllister:  Earlier I asked you what is your liability insurance for your company, and you stated you didn't have any liability insurance for this matter.  Was that correct?
> Atty. Capozzola:  I don't recall being asked about liability insurance.  But what's your question?
> McAllister:  How much is your liability insurance for this company representing Price Rite?
> Atty. Capozzola:  You know, I don't know.  Let's go off the record for a moment.
> > [Off the record Mr. McAllister asked about liability insurance.  I told him I did not know what the situation was with regard to liability insurance for this case.]
> McAllister:  And you don't know how much, either?
> Atty. Capozzola:  Correct.  If there is any, I don't know how much it is.

[Dkt. 46-3 Exh. L, P's Depo. 92:19 – 93:15 (21-22/23)].  This deposition testimony does not support Plaintiff's contention that Price Rite has funds only to pay for its legal representation.  Rather, as indicated clearly in the transcript, Defendant's counsel specifically noted that he had no knowledge of Price Rite's liability insurance.  This response is insufficient to demonstrate any bias by Price Rite.  Plaintiff's argument is thus irrelevant.  Indeed, Plaintiff's maintenance of liability insurance is irrelevant to the issue of whether the Plaintiff is able to sustain his burden of production in this case.

Second, Plaintiff argues that Defendant's motion for summary judgment should be denied because the motion was filed on October 17, 2012, two days after the deadline set by the Court for dispositive motions.  Defendant affirmed that the delay in filing its motion was a consequence of confusion as to paper versus electronic filing, and has further affirmed that it both served its motion on the Plaintiff on October 15, 2012 and mailed the paper motion to the Court on the same day via overnight mail based on instructions received from the Court clerk's office.  [Dkt. 46-2, Capozzola Cert. ¶4].  The Court notes that although the Plaintiff argues for denial of the Defendant's summary judgment motion based on timeliness, he fails to mention that his own motion for summary judgment was filed on November 5, 2012, more than two weeks after the deadline.  The Court rejects Plaintiff's timeliness arguments and, by its inherent authority to manage its dockets as it sees fit, *sua sponte* grants a *nunc pro tunc* extension of the dispositive motion filing deadline to November 5, 2012.  The Court thus deems both motions to have been timely filed.

Third, the Plaintiff maintains in his motion that he "has requested discovery for any surveillance reports of the racial make up of ALL meat supervisors employed by PRRC, Inc. and its parent company.  To date those findings have not been forthcoming."  [Dkt. 44, P's MSJ, p. 4, ¶7].  Counsel for Price Rite has affirmed that Price Rite has never received any discovery demands from the Plaintiff, who has largely refused to cooperate in discovery throughout the litigation, as reflected in Price Rite's numerous entreaties to the Court for assistance in obtaining discovery.  [Dkt. 46-2, Capozzola Cert. ¶¶2, 3].

Notwithstanding that the docket in this case is replete with examples of Plaintiff's failures to cooperate,[4] that Plaintiff's alleged discovery request is unclear on its face, and that Plaintiff never sought assistance from the Court stemming from the alleged non-production of requested discovery, the time for discovery in this case has long since passed.  Plaintiff filed this action on November 19, 2009.  The deadline for all discovery was originally set for January 14, 2011.  [Dkt. 17, Scheduling Order].  After being administratively closed on August 23, 2010, this case was reopened on December 21, 2011.  Thereafter, Defendant filed a series of requests with this Court for assistance in assuring Plaintiff's compliance with discovery, which had not been forthcoming.  Finally, on August 2, 2012, the Court ordered that this case would be dismissed if the Plaintiff continued to not comply with the Defendant's discovery requests and request for deposition.  On August 31, 2012, Price Rite moved to bifurcate liability and damages discovery and to file a motion for summary judgment, due in large part to the difficulty it had faced in obtaining discovery on liability from the Plaintiff.  The Plaintiff did not oppose this request.  The Court granted Defendant's motion to file a dispositive motion on September 6, 2012, and granted the motion to bifurcate on February 16, 2013.

---

[4] *See* docket entry no. 27, 3/6/12 (Defendant's motion for telephonic discovery conference based on Plaintiff's failure to respond to discovery requests); docket entry no. 29, 3/27/12 (Defendant's second motion for telephonic discovery conference based on Plaintiff's failure to respond to discovery requests and failure to communicate with the Defendant by email or otherwise); docket entry no. 32, 6/18/12 (Defendant's motion for sanctions resulting from Plaintiff's refusal to meet and confer regarding a discovery plan, his refusal to respond to written discovery requests, and his termination of his deposition); docket entry no. 36, 8/2/12 (this Court's Order mandating dismissal of the case if Plaintiff had not complied with discovery requests and submitted to a deposition by a certain date); and docket entry no. 38, 8/31/12 (Defendant's motion to bifurcate discovery based in part on Plaintiff's unwillingness to cooperate in the discovery process).

The Plaintiff makes no mention of *when* he allegedly requested discovery from Price Rite and has nowhere indicated that he sought this discovery prior to the Defendant's filing of its summary judgment motion.

"In a summary judgment context, an opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138, (2d Cir. 1994) (internal quotation and citation omitted). "Requests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in pursuing discovery are disfavored." *Id.* at 1139. This action was filed nearly four years ago. Both parties have had ample time, reason, and opportunity to have completed discovery as to the Defendant's alleged liability, and both parties were or should have been fully aware of the need to participate in such discovery given the Court's frequent intervention in the discovery process. Consequently, to the extent that the Plaintiff seeks additional discovery at this late date, the time has long passed for the Plaintiff to seek such discovery. *See Latimore v. NBC Universal Television Studio*, No. 11–1202–cv, 2012 WL 1863787, at *1 (2d Cir. May 23, 2012) (affirming district court's denial of additional discovery where plaintiff had "more than enough time to conduct discovery, and she did not demonstrate that further discovery would likely uncover any evidence of [copyright violations]."); *Cornell v. Kapra*, No. 11–530–cv, 2012 WL 1506049, at *1 (2d Cir. May 1, 2012) (affirming district court's denial of additional discovery where six months elapsed without either party

noticing a deposition, and where plaintiff failed to file an affidavit sufficiently explaining the need for additional discovery as required by Rule 56(d)).

Lastly, Plaintiff argues that the affidavits and certifications submitted by the Defendant and its witnesses are inadmissible hearsay, as "[o]nly 1 witnesses [sic] was present during the alleged misconduct which was the store manager Tom Veale," and "none of [Defense Attorney Capozzola's, Pat Stramaglia's, Robert Armor's, or Tom Veale's] purported testimony is of first hand knowledge of any wrong doing allege [sic] against the plaintiff."  [Dkt. 44, P's MSJ, pp. 3, 6, ¶¶6, 15].  The Plaintiff thus requests that the Capozzola, Stramaglia, Armor and Veale affidavits be stricken.  Plaintiff's request is denied, as each of the affidavits submitted in support of Price Rite's motion for summary judgment is based on the personal knowledge of the affiant.  Contrary to Plaintiff's alleged belief, it is irrelevant whether witnesses other than Tom Veale physically witnessed Plaintiff stealing company time, as each of Price Rite's witnesses has affirmed his or her personal involvement in the chain of events leading up to Plaintiff's termination.

I.    <u>Conclusion</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.  The Clerk is directed to enter judgment in favor of Defendant and to close this case.

**IT IS SO ORDERED.**


_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: September 13, 2013**